Arthur B. Clemens and Eleanor L. Clemens v. Commissioner.
Clemens v. Commissioner
Docket No. 496-67.
United States Tax Court
T.C. Memo 1969-235; 1969 Tax Ct. Memo LEXIS 61; 28 T.C.M. (CCH) 1225; T.C.M. (RIA) 69235; November 4, 1969. Filed Ardy V. Barton, 922 State, Santa Barbara, Calif., for the petitioners. Richard G. Daly, for the respondent. RAUM
Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies in petitioners' income tax, and additions to the tax, as follows: *90
Additions to Tax, I.R.C. 1954
TaxableYear
Tax
Sec. 6651(a)
Sec. 6653(a)
1961
$ 2,928.43
$ 732.10
1962
26,396.83
5,210.73
$1,319.84
1963
48.17
4.82
The Commissioner concedes that petitioners are not liable for an addition to tax under section 6653(a), I.R.C. 1954 for the taxable year 1962. Petitioners have conceded that they failed to report income in the amount of $16,000 received during the taxable year 1962. The only issues remaining for consideration are: (1) Whether a valid consent under subchapter S was filed by all the shareholders of San Marcos Lanes, Inc., so as to allow petitioners, shareholders of that corporation, to deduct their distributive share of the corporation's net operating losses; and (2) Whether loans made by petitioner Arthur *63 B. Clemens to San Marcos Lanes became worthless during 1962. Findings of Fact Some of the facts have been stipulated and are so found. The petitioners, Arthur B. Clemens and Eleanor L. Clemens, are husband and wife. They resided in Santa Barbara, California at the time they filed their petition herein. They filed joint income tax returns for the years 1961, 1962, and 1963 with the district director of internal revenue at Los Angeles, California. They reported their income on the calendar year basis. The husband will sometimes be referred to as "petitioner" or "Clemens" herein. San Marcos Lanes, a partnership, was established during 1960 to engage in the bowling alley business in Santa Barbara, California. It maintained its books of record and account and filed its income tax information return using the accrual method of accounting for the calendar year. Petitioners originally had a 20 percent interest in the partnership. The adjusted basis of the Clemens' interest in the partnership, decreased by their distributive share of the loss of the partnership year 1960, was zero. San Marcos Lanes, Inc. ("San Marcos"), a California corporation, succeeded to the assets and assumed *64 the liabilities of the partnership effective January 1, 1961 in return for its capital stock which was distributed to the former partners. The relevant tax returns treated this transaction as one in which neither gain nor loss was recognized. The Commissioner has not questioned this treatment. Petitioners held 25 1/2 percent of the corporate stock as of the time of incorporation. The Clemens' basis in the stock of San Marcos was zero at all relevant times. San Marcos kept its books of record and account and filed its income tax returns using the accrual method of accounting for the calendar year. On or about January 1, 1961, the stock register of San Marcos stated that the owners of the shares were John L. Warren, Harold E. Dillard, Paul J. Abate, Roger J. 1226 Guge, Arthur B. Clemens, Donald A. McCannel, and Melvin Shirley. One shareholder was an unmarried man. The remaining shareholders, including the petitioners, were married, and their stock was community property; the female spouses were not listed as shareholders in the stock register. San Marcos reported net operating losses of $88,251.85 and $315,464.74 for the calendar years 1961 and 1962, respectively. It is agreed *65 that the corrected net operating losses were $60,111.70 and $286,154.92, respectively. On February 1, 1961, San Marcos filed an "Election by Small Business Corporation," dated January 26, 1961, as to its taxable status under subchapter S of the Internal Revenue Code. The "Shareholders Statement of Consent" attached thereto was signed only by the unmarried male shareholder and the husbands of those owning their shares as community property. Clemens' wife, as well as the other wives, did not then or at any other time sign this consent. No further election or consent has been filed with the Commissioner. As a result of inadequate financing and unprofitable business operations the San Marcos venture was faced with financial difficulties. Petitioner made an advance to or on behalf of the corporation in the amount of $60,000. This loan was followed by another loan by petitioner in the summer of 1961 in the amount of $5,000. In June 1962 he made a third loan to the corporation, in the amount of $145,000, as hereinafter set forth. Another stockholder, Donald A. McCannel, had also made a loan to the venture, in the amount of $50,000. As of March 31, 1962, the unaudited books of the corporation *66 showed liabilities of approximately $823,000. A great part of the liabilities of the corporation represented also the liabilities of the former partnership and therefore of the partners. The record does not disclose the total assets of the corporation as of this time. On April 4, 1962, the corporation held a meeting of its board of directors to consider the financial difficulties encountered in the operation of the bowling alley business. The minutes of that meeting described the financial condition of the corporation as follows: SAN MARCOS LANES is faced with this immediate crisis. The note at the Bank of America which has been past due since October 1960 must be paid now. Mr. Hofer has indicated legal action would be started on Friday, April 6, 1962, unless the note is taken care of. Mr. A. Leonard Page, County Tax Collector, stated that he must forthwith post the property for sale to pay in excess of $9,000.00 personal property taxes. In addition, Mr. Alfred Meyers, holder of the first trust deed which has been in default since June 12, 1961, will cause the property to be advertised for sale under the power of sale contained in the trust deed, on April 15, 1962. In order to *67 avoid the impending crisis the board of directors approved the sale of the corporation's assets and business to one Harold Gelber ("Gelber") of Beverly Hills, California. A sales agreement was entered into with Gelber under which Gelber promised to undertake to discharge the corporation's liabilities up to the amount of $850,000, holding the shareholders of San Marcos free and clear of the corporate liabilities up to this amount. Though Gelber signed this agreement in April 1962, he purported to rescind it in May of 1962. As a consequence, a lawsuit was commenced in May or June of 1962 in the Superior Court of California. This lawsuit included an action by petitioners against Gelber for damages resulting from the alleged breach of the terms of the apparent contract. This action had been tried as of the time of the trial herein but no final decision had then been entered. However, in November of 1968, the Superior Court entered a memorandum of decision favoring Gelber on the ground, first, that there was no intent to have a contract, and second, that there was timely rescission of the contract. The memorandum also stated that Clemens did not commit fraud on Gelber in inducing him to *68 enter the sales agreement. After the deal with Gelber fell through the financial condition of San Marcos did not improve. At a meeting of the board of directors held on June 22, 1962, it was disclosed that the holder of the first trust deed on the corporation's real property planned a foreclosure sale on June 28, 1962. This sale would have caused the other creditors to press their claims against the corporation and its shareholders. In order to avoid the foreclosure, the San Marcos board approved an arrangement presented by one John W. Watling, Jr. ("Watling"). Under Watling's plan, the corporation sold its real estate to Watling for $335,000, which money was used to pay off the holder of the first trust deed. The corporation then entered into a lease agreement 1227 with Watling, dated June 30, 1962, wherein it leased back all the real estate sold to Watling for a period of six years at a monthly rental of $2,700. As a further part of Watling's package San Marcos, pursuant to a separate agreement of sale dated June 30, 1962, sold all of the personal property used in the business, including such items as the San Marcos Lanes' trade name, bags, balls, business equipment, liquor *69 licenses, etc. to Panorama Bowl, Inc. ("Panorama"). Panorama paid San Marcos $26,726 for this property and in addition assumed the following obligations of San Marcos: 1. Contract for purchase of lanes and bowling equipment from AMF Pinspotters in a sum not to exceed $136,262.00. 2. Contract for lease of 32 AMF pinspotter machines in a currently paid condition. 3. Contract for purchase of Ripley Bowling Pins in a sum not to exceed $5,746.00. 4. A contract for the purchase of carpeting from the Carpet Center in the sum of not to exceed $11,380.60. 5. Contract for the purchase of Sweda Cash registers with the Security First National Bank in the sum not to exceed $2,875.05. 6. Contract to purchase restaurant and bar equipment from Dale Bros. in the sum not to exceed $16,676.45. 7. Sound system lease with General Dynamics in a currently paid condition. 8. Advertising sign lease with Modern Neon Sign Company in a currently paid condition. The stockholders, however, remained liable for these items despite Panorama's assumption. At the same time San Marcos sold its personal property to Panorama, San Marcos entered into a sublease agreement with Panorama, dated June 30, 1962. Under *70 this agreement, San Marcos subleased to Panorama for a period of six years, that portion of the real estate used in the bowling alley operation. The monthly rental was to be.$3,733.33. The building consisted of two floors; certain space in the upper floor was not used in the bowling alley business and was therefore not included in the sublease. In addition to the monthly rental, Panorama agreed to pay its proportionate share of the costs of the real estate taxes and maintenance expenses. San Marcos made an assignment of rents due from Panorama to Watling on June 30, 1962. Panorama was informed of this assignment in the following letter dated June 30, 1962: Santa Barbara, California
June 30, 1962 Panorama Bowl, Inc., c/o Equities Control Corporation 3921 Wilshire Boulevard Los Angeles 5, California
Gentlemen: It is hereby requested that in lieu of making payment to us of the monthly rental of $3,733.33, as called for under our lease of even date, you make the following payments, which same will be credited against your above rent, any shortage or overage to be periodically adjusted between us at such times as may be convenient to you: 1. To John W. Watling, Jr., *71 on the first day of each month, the sum of $2,700.00; 2. Payments on the attached CIT contract as the same fall due; 3. All real property taxes for the entire property; 4. All utility bills except telephone, and except any separately metered bills; 5. All insurance premiums relative to the entire property, particularly fire, public liability, and use and occupancy; 6. All minor repairs and maintenance. Items 3, 4, 5, and 6 will in the main be subject to pro ration and adjustment between us, which we will do from time to time as you find convenient. Beyond that we are not free to modify or vary the foregoing without Mr. Watling's consent, all rentals payable to us under the aforesaid lease having been heretofore assigned to him. If the foregoing meets with your approval, kindly indicate same on the two extra copies hereof enclosed for that purpose and return one to us and one to Mr. Watling. * * * The minutes of the corporation indicated that the above transactions were expected to produce cash which was approximately $145,000 [1] short of meeting the total corporate debt, most of which was also the personal obligation of the original partners in the enterprise. [2] The *72 remaining $145,000 1228 needed by the corporation to pay its debts was obtained in the following manner. As part of the overall arrangement worked out by Watling, Clemens sold his one-half interest in a 7 1/2 acre parcel of real estate located adjacent to the San Marcos bowling alley to Watling, the other one-half owner, for $145,000. Instead of receiving the $145,000 from Watling, Clemens had Watling disburse part of the funds to creditors of San Marcos. The remaining funds, approximately $62,000, were deposited with an attorney, one Howard Parke ("Parke"), to be disbursed to creditors at Clemens' direction. The bulk of the funds held by Parke was disbursed to creditors in 1962 and the remainder, approximately $4,500, was disbursed in 1963. Clemens regarded the $145,000 disbursed on behalf of San Marcos as a loan to San Marcos. He had theretofore received some repayment from the corporation on its prior indebtedness to him, and after this loan of $145,000 the corporation owed him $196,275.85. *73 Clemens' $145,000 advance was secured by the corporation's interest in the master lease and in the leases to the subtenants, Panorama and Defense Research Corporation, a sublessee of the office space on the second floor of the building, as hereinafter set forth. During 1962, after the avove sale and lease transactions, approximately $43,000 was paid on behalf of the corporation by Watling or through the Parke account to or for the benefit of Clemens in partial satisfaction of the corporation's indebtedness to him. This amount consisted of a cash payment of approximately $23,000 to Clemens and the payment of $20,000 by Watling (out of the $145,000) to Clemens' personal lawyer, Parke, as attorney's fees with respect to Clemens' involvement with the bowling alley. An additional $1,600 was paid to Clemens in January 1963. An additional $1,500 was paid to Parke in 1963 out of the account held by Parke. During 1962 Clemens had received interest from San Marcos in the amount of $5,850. At the completion of the sale and lease transactions set forth above San Marcos' only asset was its lease with Watling of the bowling alley building and real property, which it in turn rented to two *74 sublessees, Panorama and Defense Research Corporation ("Defense Research"). Defense Research had actually begun to occupy the second floor office space in 1961, and it continued to occupy that space as a sublessee of San Marcos pursuant to a lease beginning July 1, 1962 which expired in August 1963. Its annual rental was $29,400. After expiration of its lease it in fact remained in possession on a month to month basis until sometime during late 1963. It paid all the rent required under the lease as well as for the period of occupancy thereafter. It paid such rentals to Parke for disbursements to the creditors of San Marcos. After Defense Research vacated the premises, its space remained unoccupied for approximately three years. At the time the arrangements were worked out with Watling in June 1962, Clemens was hopeful that San Marcos might some day repay his advance through the income it would receive under its subleases to Panorama and Defense Research. Panorama began its operations sometime in July 1962. Within a very short period it became apparent that it could not operate profitably due to a heavy decline in the bowling alley business. As a result, it was unable to make payments *75 on the obligations assumed by it to certain creditors of San Marcos after October 1962 and these creditors threatened suit against Clemens. Panorama ceased paying its rent by May 1963. In January 1963, the lease from Watling, which had previously been pledged to Clemens as security for the corporation's indebtedness to him, was assigned directly to him. While the rents were paid directly to Watling, Clemens received a satisfactory accounting for the amounts paid which exceeded the rent due Watling. In September of 1963 a Dr. Sartorius ("Sartorius"), the owner of another bowling alley in competition with San Marcos Lanes offered to purchase the San Marcos lease from Clemens in order to reduce competition with his bowling business, Fiesta Bowl. In October 1963, Clemens sold Sartorius the San Marcos lease for $75,000, which amount was credited to the amount due Clemens from the corporation. No other amounts were thereafter repaid to Clemens with respect to his loans to San Marcos. Panorama agreed to vacate the premises during that month. Later in the year Sartorius closed San Marcos Lanes and the property remained vacant for approximately a year. Thereupon, Sartorius closed Fiesta *76 Bowl and moved his operation to the San Marcos building. 1229 Clemens made various payments in respect of the debts of the San Marcos partnership in the years following 1962. In January of 1965 Clemens and Donald A. McCannel, a former partner, each paid $9,500 in settlement of a suit brought by one Arthur Jacobs, a creditor of the partnership. Approximately $4,000 of this amount was repaid by Jacobs to Clemens at a later time. Other than this payment by McCannel, Clemens did not seek or receive contribution from any of his former partners in respect of the amounts he paid on behalf of the partnership. Clemens believed such former partners to be without assets. An undetermined amount of the debts of the partnership was still outstanding at the time of the trial herein. Petitioners reported the sale of their stock in San Marcos for $45,050 in January 1963. "Cost" of this stock was stated to be $4,867.28 and a long-term gain in the amount of $40,182.72 was reported. Petitioners deducted their proportionate shares of the net operating losses of San Marcos Lanes for the losses incurred during 1961 and 1962. Petitioners' return for 1962 indicated the deduction of the amount *77 of $192,433.49 as their portion of the net operating loss of San Marcos. This figure was apparently intended to include an unspecified amount in respect of the alleged worthlessness during 1962 of Clemens' loans to San Marcos. The Commissioner disallowed the above deduction and, in his deficiency letter stated: Since your income tax returns were not filed within the time prescribed by law, 25 per centum of the tax has been added thereto for the taxable year ended December 31, 1961, 20 per centum of the tax has been added thereto for the taxable year ended December 31, 1962, and 10 per centum of the tax has been added thereto for the taxable year ended December 31, 1963, in accordance with the provisions of section 6651(a) of the Internal Revenue Code of 1954. Petitioners contest only the deficiencies asserted by the Commissioner and do not contest the additions to tax under section 6651(a), I.R.C. 1954. Opinion RAUM, Judge: 1. The first issue is whether petitioners are entitled to deduct amounts under section 1374(a), I.R.C. 1954, [3] as their portion of the net operating losses incurred by San Marcos *78 Lanes for the taxable years 1961 and 1962. The resolution of this issue depends on whether the subchapter S election filed by San Marcos Lanes was valid. Section 1372(a) of the Code provides in pertinent part that "[such] election shall be valid only if all persons who are shareholders in such corporation * * * consent to such election." (Emphasis added.) Petitioners concede that they and the other married San Marcos shareholder owned their stock as community property. They further concede that the consents filed on January 6, 1961 pursuant to section 1372(a) were signed only by the husbands of those owning stock as community property. Since Mrs. Clemens and the wives of *79 the other married shareholders must in turn be treated as San Marcos shareholders as a consequence of their admitted community interest in the stock standing in their husbands' names, the consents required by subchapter S were not filed by all the corporation's shareholders. Homer W. Forrester, 49 T.C. 499. Petitioners argue that Forrester is inapplicable because the election involved in that case was made April 23, 1962 whereas the election here in issue was made January 6, 1961. The significance of these two dates, they contend, is that Congress first recognized the requirement that both spouses owning stock as communtiy property consent to the election under subchapter S when it enacted section 1372(g)[4] on May 4, 1961. This position, however, ignores T.D. 6432, 1960-1 C.B. 317, 320, which was published in the Federal Register for December 19, 1959, 24 Fed. Regs. 10294. This Treasury Decision provided in part: *80 1230 § 1.1371-1 * * * (d) * * * (2) Stock owned by husband and wife * * * in determining whether a corporation meets the 10 or fewer shareholder requirement of section 1371(a), stock which - (a) Is community property of a husband and wife (or the income from which is community income) under the applicable community-property law of a State, * * * shall be treated as owned by one shareholder. * * * This subdivision applies only in determining the number of shareholders for purposes of section 1371(a)(1) and does not apply for purposes of any other provision of subchapter S of the Code. Thus, for example, the husband and wife will each be considered a shareholder for purposes of section 1372(a), relating to the requirement that all shareholders consent to the corporation's election * * *. (Emphasis added.) The Court in Forrester, in its discussion of the history of section 1372(g), makes clear that these provisions of T.D. 6432 were consistent with the Congressional mandate with respect to the election under subchapter S, and that such provisions were valid at the *81 time of the election here in issue. In Forrester, at 506-7 the Court notes: S. Rept. No. 163, * * * 1961-2 C.B. 351, accompanying Pub. L. 87-29, makes it clear, we think, that Congress was aware of respondent's position requiring consents from coowner spouses in community property States and constitutes an approval of this position. S. Rept. No. 163 states, in part: The Committee on Finance added to the House-passed bill an amendment to extend to May 15, 1961, the period in which the spouse of a shareholder in a small business corporation may consent to an election not to be taxed as a corporation. The title of the bill was appropriately amended also. Under subchapter S, certain small business corporations were permitted to elect not to be taxed as a corporation. The Treasury Department has taken the position that in the case of an election under this section in a community property State, both husband and wife must make the election. In many situations in community property States, the husband operating as a small business corporation made the election but did not have his wife sign the document. Such elections the Treasury now holds are invalid, and as the elections *82 had to be signed within a specified time, the period has expired in which the wife and the husband may now perfect the election. The amendment adopted by the Committee on Finance permits the spouse not signing the election additional time to sign the election. The extended date for perfecting such election is May 15, 1961. If this amendment is not adopted, many small businessmen in community property States will not be able to take advantage of subchapter S, permitting certain small business corporations not to be taxable as corporations. The amendment only applies where a timely election in the first instance was made by one of the spouses. Petitioners also argue that since the husband has the power of management and control over the community property in California the wife cannot exercise authority over that property which would negate such powers. Thus, they argue, the husband's consent bound the wife and was therefore effective for the purposes of subchapter S. This argument was made and rejected in Forrester (49 T.C. at p. 507): Respondent does not dispute that under Arizona law the husband is manager of the community. He contends, however, the State law *83 designating the husband as manager of the community cannot affect the Federal tax law requiring that "both" spouses must sign the consents, citing Burnet v. Harmel, 287 U.S. 103 (1932), and Commissioner v. Tower, 327 U.S. 280 (1946). We agree with the respondent. The election under subchapter S requires the consent of all "shareholders" regardless of their powers of control under State community property law. The question then, is one of ownership, not managerial control. In view of the wives' conceded community property interest in the stock, we hold that their failure to join in the consents renders the election filed by San Marcos Lanes ineffective and that, accordingly, petitioners may not deduct their share of San Marcos' net operating losses. Petitioners also make sweeping contentions on constitutional grounds that the Government's position is violative of due process of law under "Amendments V and XVI", and that it is also in conflict with the "Constitution's mandate of separation of powers and checks and balances, U.S. Constitution, Articles I and II * * *." We think that these contentions are wholly without merit. 1231 2. The second issue *84 is whether Clemens realized a capital loss in 1962 because his loans to San Marcos became "worthless" in that year. Section 166(d), I.R.C. 1954, provides that an individual realizes a capital loss "where any nonbusiness debt becomes worthless within the taxable year". We hold that the evidence presented by the petitioners herein fails to support their contention that the loans made to San Marcos became worthless in 1962. Under an arrangement calculated by the shareholders of San Marcos to meet the pressing obligations of creditors San Marcos sold its realty and tangible personal property in June of 1962. The cash received from the sale plus the amount of corporate obligations assumed by the purchasers fell short of paying all corporate indebtedness by the amount of $145,000. Clemens lent San Marcos the additional $145,000 needed to pay its outstanding indebtedness, and after that loan its net aggregate outstanding debt to him was $196,275.85. This advance was secured by San Marcos' interest in its master lease of the bowling alley building and realty from Watling and *85 the subleases by San Marcos to Panorama and Defense Research. It was Clemens' hope that through these financial arrangements San Marcos might eventually repay his loan. The key question for decision here is not whether San Marcos' debt to Clemens ever became worthless, but simply whether it was worthless as of the end of 1962. The burden of proof was on petitioners. Their counsel has presented us with a highly confusing record and we cannot find that the burden has been carried. There is little doubt that San Marcos was in financial difficulty before and during 1962. The facts presented, however, coupled with petitioners' failure to produce complete balance sheets and income statements as to the condition of the corporation at the time in issue, make it extremely difficult to conclude that the San Marcos debt was worthless, and on the basis of the evidence before us it appears that San Marcos' debt was anything but worthless by the end of 1962. We take note initially of the fact that Clemens not only received interest from San Marcos during 1962 in the amount of $5,850, but that he also *86 received repayments of principal in the aggregate amount of approximately $43,000 between July and December 1962 from San Marcos which were paid either directly to him or made in his behalf. [5] Clemens received a further repayment from San Marcos of $1,600 in January 1963. Also, his attorney, Parke, received $1,500 in 1963 out of the fund held for payment to San Marcos' creditors. Two other factors must be taken into account in determining whether the San Marcos debt was shown to be worthless as of the end of 1962. The record shows that petitioners sold their San Marcos stock in 1963 for $45,050, a fact wholly inconsistent with the notion that any *87 debt of the corporation was entirely worthless by the end of 1962. And secondly, the San Marcos master lease was assigned to Clemens in January 1963 as security for its indebtedness to him, a lease that he sold later in 1963 for $75,000 when its unexpired term was less than five years. This case has many puzzling aspects, but when we add to the foregoing considerations the fact that the corporation was still a functioning entity as of the end of 1962, owning a lease in respect of which substantial rentals were then being paid by the sublessees, we cannot find that petitioners have carried their burden of proving that the San Marcos debt became worthless in 1962. Cf. Trinco Industries, Inc., 22 T.C. 959, 965. Clemens has argued in the alternative that his $145,000 advance to San Marcos is deductible because the funds were used to discharge debts of his partnership. We disagree. It is clear that Clemens intended his advances to San Marcos to be loans, not merely payments in respect of his partnership obligations. Clemens expected all his advances to be repaid and in fact received substantial repayments on the amounts advanced. Further, Clemens accepted the assignment *88 of the San Marcos master lease to secure his $145,000 advance, and he subsequently sold that lease for $75,000. Since his advances were intended as loans and treated by the parties accordingly, we cannot accept petitioner's alternative theory that these advances are deductible expenses. Decision will be entered under Rule 50. 1232 Footnotes
1. This figure apparently takes into account Panorama's assumption of the corporate liabilities shown above. ↩
2. The amount for which the partners remained liable, should Panorama fail to meet its obligations, was estimated by Clemens to be approximately $469,000.↩
3. SEC. 1374. CORPORATION NET OPERATING LOSS ALLOWED TO SHAREHOLDERS. (a) General Rule. - A net operating loss of an electing small business corporation for any taxable year shall be allowed as a deduction from gross income of the shareholders of such corporation in the manner and to the extent set forth in this section.↩
4. SEC. 1372. ELECTION BY SMALL BUSINESS CORPORATION. * * * (g) Consent to Election by Certain Shareholders of Stock Held as Community Property. - If a husband and wife owned stock which was community property (or the income from which was community income) under the applicable community property law of a State, and if either spouse filed a timely consent to an election under subsection (a) for a taxable year beginning before January 1, 1961, the time for filing the consent of the other spouse to such election shall not expire prior to May 15, 1961.↩
5. $20,000 of this amount was paid to petitioner's own lawyer for services related to his financial problems. The petitioners argue on brief that this amount should be deductible. This issue had never previously been raised and no evidence was presented as to the precise nature of the services for which such fees were paid. Quite possibly, if the facts had been fully developed, there might have been no basis for the claimed deduction. In the circumstances, we do not regard this issue as properly before us, and we do not consider it.↩